# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

JASON HURST,
NICOLA MORELAND,                    Case No.: _____
and BENNETT HARRELL,

      Plaintiffs,

vs.

CITY OF GAINESVILLE,
GAINESVILLE POLICE DEPARTMENT,
DETECTIVE RONALD A. PINKSTON,
SWAT TEAM COMMANDER LIEUTENANT
M. WEST, JOHN DOES #1-15 (ADDITIONAL
UNNAMED SWAT OFFICERS),
JOHN DOES #16 - #30 (ADDITIONAL
UNNAMED INVESTIGATING OFFICERS),

      Defendants.

_____/

## COMPLAINT FOR DAMAGES

COME NOW **JASON HURST**, **NICOLA MORELAND**, and **BENNETT HARRELL** (together "Plaintiffs") and file this Complaint for Damages against the **CITY OF GAINESVILLE, THE GAINESVILLE POLICE DEPARTMENT, DETECTIVE RONALD A. PINKSTON, SWAT TEAM COMMANDER LIEUTENANT M. WEST, JOHN DOES #1-#15 (ADDITIONAL UNNAMED SWAT OFFICERS)** and **JOHN DOES #16-**



**#30    (ADDITIONAL    UNNAMED    INVESTIGATING    OFFICERS)**
(together "Defendants"), and state:

1.     This is a civil rights action brought pursuant to 42 U.S.C. § 1983 seeking damages against the above-captioned Defendants for violating the Plaintiffs' rights guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States of America.

## JURISDICTION AND VENUE

2.     Jurisdiction is proper in this Court. 28 U.S.C. §§1331 and 1343. Plaintiffs invoke the supplemental jurisdiction of the Court to hear and decide Plaintiffs' state law claims. 28 U.S.C. § 1367(a).

3.     Venue is proper in this Court as Defendants are located within the boundaries of this judicial district, where the events giving rise to Plaintiffs' claims occurred. 28 U.S.C. § 1391(b).

## PARTIES

4.     Plaintiff JASON HURST ("Hurst") is a resident of Gainesville, Florida, and at all times relevant to this dispute was a commercial real estate broker employed by Colliers International Florida, Inc. ("Colliers International").

5.      Plaintiff NICOLA MORELAND ("Moreland") is a student at the University of Florida, and at all times relevant to this dispute was an analyst intern employed by Colliers International under the supervision of Hurst.

6.      Plaintiff BENNETT HARRELL ("Harrell") is a resident of Gainesville, Florida, and at all times relevant to this dispute was an associate commercial real estate broker employed by Colliers International.

7.      Defendant CITY OF GAINESVILLE ("Gainesville") is a municipality located in Alachua County, Florida.   Pursuant to Florida Statute § 48.111, Gainesville may be properly served upon its mayor, Lauren Poe or, in his absence, on any member of the City Commission.

8.      Defendant GAINESVILLE POLICE DEPARTMENT ("GPD") is the police department of the City of Gainesville.

9.      Defendant, DETECTIVE RONALD A. PINKSTON ("Detective Pinkston") is, and at all relevant times has been, a detective employed by the GPD.

10.      Defendant, SWAT COMMANDER LIEUTENANT M. WEST ("Commander West") was at all relevant times Commander of the GPD Special Weapons and Tactics ("SWAT") team.

11.    JOHN   DOES   #1-#15,   ADDITIONAL   UNNAMED   SWAT
OFFICERS, are as yet unidentified GPD police officers who were part of the
SWAT team that served the search warrant on June 2, 2021, at the Colliers
International office building.

12.    JOHN   DOES   #16-#30,   ADDITIONAL   UNNAMED
INVESTIGATING OFFICERS, are as yet unidentified GPD police officers
that were part of the investigating team that conducted the search of the
Colliers International office building on June 2, 2021.

## FACTUAL ALLEGATIONS

13.    On the morning of June 2, 2021, commercial real estate broker
Jason Hurst left home to go into work at Colliers International.  His office at
107 SW 7th Street in Gainesville was in an urban, uneventful, low-crime
neighborhood.   The Colliers International's office is a well-maintained
commercial office building suitable for a high-end professional services
company like Colliers International.

14.    After getting to work at around 9:15 a.m., Hurst greeted Nicola
Moreland, his intern and a student at the University of Florida, and then
began his normal morning routine, preparing for the day's work.

15.    What neither Hurst nor Moreland knew was that, concealed outside their office, a heavily armed unit of 14-20 officers from the Gainesville Police Department's Special Weapons and Tactics Team ("SWAT") was preparing to occupy the office building. They also didn't know that the SWAT team had covertly surveilled both Hurst and Moreland as they arrived for work that morning.

16.    SWAT's presence at the Colliers International office that morning had nothing to do with Hurst or Moreland.  As would later become clear, this massive show of force had been inexplicably and unreasonably deployed to serve a search warrant for electronic records in an investigation into allegations of trade secret theft made by a competitor against several of Hurst's and Moreland's work colleagues who were also involved together in an acrimonious civil lawsuit.

17.    Neither Hurst nor Moreland were suspected of any criminal activity. Nor were they under any investigation of any type. Nor were they believed to (nor did they) have any role in the criminal complaint or in the civil litigation.  The SWAT team surveilling the Colliers International office that morning was fully briefed before the raid, and knew that Hurst and

Moreland were mere bystanders who had nothing to do with their investigation.

18.     Shortly after Hurst arrived at work, the SWAT team moved on the Colliers International office. Armed officers ordered Hurst, Moreland, and a third employee out of the building. The officers marched the confused employees out of the office at gunpoint. The employees hands were zip tied behind their backs. The employees were lined up against a wall facing away from the officers. The employees were then held in custody against their will for nearly two hours.  Officers seized their personal property, including their cell phones, and even Hurst's Apple watch. The personal property of Hurst and Moreland was not returned for months, despite numerous requests. It took a lawsuit to get their property back.

19.     Plaintiff Bennett Harrell, also a commercial real estate broker for Colliers International, arrived at the Colliers International office for work while the SWAT Raid was already underway.  Like Hurst and Moreland, Harrell was not under suspicion nor under investigation for any criminal activity and was unrelated to the civil dispute.

20.     Harrell was shocked when he saw the fully deployed SWAT team that was in the process of entering the Colliers International office.

Harrell's first thought was that it must be some sort of a hoax—maybe a bomb threat, or a "swatting prank."

21.   Harrell saw the armored SWAT vehicle. He saw over a dozen officers in body armor holding military-style weapons. He watched Hurst being marched across the office parking lot, hands bound. He saw Moreland nearby, also with her hands bound.  Harrell—still sitting in his car parked in the Colliers International parking lot, dumbfounded—was suddenly surprised by a SWAT officer who appeared at his window and ordered him to exit the vehicle.  The officer marched Harrell over to his colleagues, where he was searched and his cell phone was seized (the seized personal property of Hurst, Moreland, and Harrell are, collectively, the "Plaintiffs' Personal Property").  Harrell was also held against his will for approximately two hours.

22.   The SWAT Raid was an unreasonable, unjustified, unnecessary, and wildly disproportionate use of force applied in an arbitrary and capricious way. It involved service of a search warrant for which there was no reason to believe there would be violent resistance, and for which an investigatory subpoena would have been a perfectly good substitute. The warrant was generated by a questionable police report, and was based upon

a deeply flawed—if not outright fraudulent—search warrant application. More importantly, it was caused by a policy of the GPD and the City of Gainesville that allowed for the deployment of SWAT to serve *nearly any* search warrant, regardless of the risk involved, so long as it was approved by the SWAT Commander, in his arbitrary discretion, by applying an open-ended, arbitrary, and capricious "other considerations" to an otherwise formal, well-defined SWAT matrix.

23.    The SWAT Raid was a series of gross violations of Plaintiffs' rights under the Constitution of the United States of America to be free from unreasonable searches and seizures, as well as a fracturing of Plaintiffs' basic sense that they could carry on the most mundane, law-abiding aspects of their lives without fear of suddenly being thrust into a violent encounter with life-and-death implications.

## The Underlying Trade Secret Dispute

24.    In March of 2019, four commercial real estate brokers (the "Brokers")—none of whom are Plaintiffs—separated from their employer, Bosshardt Realty Services, LLC ("Bosshardt").  In December 2019, they opened the Gainesville franchise of Colliers International, which would later

be the subject of the SWAT Raid.  At that time they began competing with Bosshardt for the same customers.

25.    Plaintiffs Hurst and Harrell began working for Colliers International in June 2020, and Moreland began her internship in May 2021 — all after the separation from Bosshardt.  None of the Plaintiffs ever had any association with Bosshardt whatsoever.

26.    At the time of the breakup, the Brokers and Bosshardt signed a separation agreement defining how future commission would be paid to the departing Brokers regarding sales that hadn't closed yet.  *See* Separation Agreement attached hereto as **Exhibit A.**   Notwithstanding the Separation Agreement, the Brokers and Bosshardt argued over unpaid commissions, and on August 18, 2019, two of the Brokers, Mike Ryals and Dan Drotos, filed a civil lawsuit (Alachua County Case No. 01-2019-CA-2859) against Bosshardt.  *See* the Civil Complaint attached hereto as **Exhibit B**.

27.    The parties mediated to an impasse on July 16, 2020.  *See* Mediator's Report attached hereto as **Exhibit C**.

28.    Though Bosshardt had never alleged trade secret theft as a claim in the civil lawsuit, two weeks after the impasse, on July 31, 2020, Aaron Bosshardt, Managing Member, filed a police report with the Gainesville

Police Department alleging grand theft of trade secrets and claiming that the Brokers had stolen Bosshardt's valuable trade secret property, in the form of customer lists, forms, old contracts, and the like ("Police Report"). *See* the Police Report attached hereto as **Exhibit D**.

29.    Subsequently, the Brokers prevailed in their civil case, the arbitrator found there were no trade secrets stolen, and awarded damages and attorney's fees against Bosshardt.

## The False Police Report

30.    The Police Report filed by Aaron Bosshardt contains indicia of fraud.

31.    The area of the report identifying the property that was allegedly stolen includes,  oddly, three automobiles, including Hurst's 2014 Tesla:

| 1 = None   2 = Burned   3 = Counterfeit / Forged     4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 ("OJ" = Recovered for Other Jurisdiction) | | | | | | |
|---|---|---|---|---|---|---|
| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model |
| *1* | *99* | *S* | *$1.00* | | *0* | *TRADE SECRETS(DOCUMENTS)* | |
| | *35DV* | *E* | *$0.00* | | *1* | *DATA DISC* | |
| | *38* | *O* | *$0.00* | | *1* | *2015 WHI ,     476UAD    FL* | *FORD F150* |
| | *38* | *O* | *$0.00* | | *1* | *2021 BLK ,     HPV9K    FL* | *GMC Denali* |
| | *03* | *O* | *$0.00* | | *1* | *2014 GRY ,     Y27EI    FL* | *TESL* |

32.    Setting aside the question of why a Police Report alleging theft of trade secrets includes three automobiles among the property reported stolen, and further setting aside the question of why one of those



automobiles belonged to Hurst — a person with no connection to the underlying trade secret dispute — the most glaring problem with this Police Report is that Hurst did not own the 2014 Tesla included in the report at the time the report was supposedly filed (July 2020).   He purchased the automobile in December 2020 — five months after the Police Report was allegedly filed.  Hurst bought the car in Illinois.  A copy of the Bill of Sale for the 2014 Tesla is attached hereto as **Exhibit E.**

33.     Put simply, the Police Report is facially fraudulent. There would have been no way to connect the 2014 Tesla, sitting somewhere in Illinois until December of 2020, with the earlier July 2020 Police Report. The Florida tag listed for the 2014 Tesla on the July 2020 Police Report was not even issued until December 2020.

34.     Therefore, the Police Report must either have been altered after-the-fact to include the 2014 Tesla, or else it is a wholesale fabrication manufactured to support the subsequently-filed search warrant application. It cannot possibly be the genuine article.

35.     The facial inaccuracies on the Police Report alone is enough to cast a grave constitutional shadow over the Fourth Amendment reasonableness of the search, seizure, and detention of Plaintiffs.

**The Search Warrant was Based on Misrepresentations**

36.     The Police Report was assigned to Detective T. Tirado, who retired in the fall of 2020 resulting in reassignment of the case to Detective Pinkston, a Defendant in this case.

37.     During his 2022 deposition in a defamation case filed by the Brokers against Bosshardt, Detective Tirado admitted that he relied on Bosshardt to conclude that the electronic materials alleged to be trade secrets were, in fact, trade secrets.

38.     Detective Tirado also admitted that Bosshardt had paid thousands of dollars to the Gainesville Police Department during the course of the investigation. Bosshardt laundered and disguised the payments by paying the Police Department's bills, like subpoena costs, to conceal any record of the money going directly *to* the Police Department.

39.     On May 26, 2021, Detective Pinkston filed an Application and Affidavit for Search Warrant in the Circuit Court ("Application").   See Application attached hereto as **Exhibit F**.  The Application sought a warrant for the Colliers International office, based on averments by Detective Pinkston of supposed evidence allegedly showing the Brokers and a Colliers International executive had engaged in trade secret theft from Bosshardt.

The Application referenced (1) evidence of various instances of the Brokers accessing Bosshardt files and documents, (2) communications between and among the Brokers and the Colliers International executive about some of these documents and files, and (3) alleged transfers of certain of these files.

40.     The Application was grossly misleading.  Among other things it:

a.      omitted a host of material facts that Detective Pinkston knew or should have known, including (1) that at the time of the filing of the Police Report, Bosshardt and several of the Brokers had been engaged for many months in a highly contentious civil dispute over nearly a million dollars in unpaid sales commissions—during which suit Bosshardt never claimed theft of trade secrets; (2) prior to the termination of their employment with Bosshardt, the Brokers and Bosshardt had entered into the Separation Agreement which gave the Brokers permission to continue pursuing pending sales leads and deals; (3) in furtherance of that agreement, after the Brokers' termination, Bosshardt continued to voluntarily allow the Brokers access to its "Appfiles drive" and other files, documents,

and resources so that the Brokers could continue to work the still pending sales pursuant to the Separation Agreement;

b.      presented the timeline of events out of chronological order in a way that suggested that instances of the Brokers accessing Bosshardt files took place after their termination when, in fact, such instances took place while they were still working for Bosshardt;

c.      misleadingly characterized the Brokers' access of the Bosshardt files as unusual or improper, while in fact such access was a regular part of the normal course of the Brokers' business;

d.      misleadingly suggested that the Brokers access of the Bosshardt files was done without permission when, to the contrary, such access was with Bosshardt's full knowledge and permission;

e.      falsely stated that the primary basis of the warrant – the access by Broker Lauren Edwards of 160 Bosshardt "Appfiles" in February of 2019—was without Bosshardt's



permission, when in fact Lauren Edwards was authorized to access "Appfiles" at that time; and

    f.    the Application never once specifically named or attached to the Application as an exhibit or example a single trade secret that the Brokers were purported to have stolen from Bosshardt.

41.    Had a truthful application been submitted to the Court, the warrant never would have been approved.

42.    Indeed, the illegitimacy of the warrant is now beyond dispute. The civil suit between two of the Brokers (the "Claimants") and Bosshardt, referred to in paragraphs 26 and 40(a) above, was ultimately ordered to arbitration by the court in that case.[1]  A final award was issued in that arbitration on June 8, 2022, (the "Arbitration Award"), granting the Brokers $732,312.28 in unpaid commissions; $77,997.72 in interest on the award; awards for costs totaling $46,091.57; and an award for prevailing party attorney's fees of $522,841.38.  No award was granted to Bosshardt.  The Arbitration Award determined that Bosshardt's "allegations that the

---

[1] *See Ryals, et al. v. Bosshardt Realty Services, LLC,* No. 01-2019-CA-2859, Eighth Judicial Circuit in and for Alachua County, Florida, Order of April 9, 2020.

Claimants improperly withheld or converted confidential property [computer files] belonging to [Bosshardt]" was unsubstantiated. See **Exhibit G**, Final Arbitration Award, ¶78.  As of the filing of this Complaint, the Brokers have moved for the court in the civil case to confirm the arbitration award.[2]

## The Scope of the Search Warrant

43.    Based on the sworn statements made in Detective Pinkston's Application, on May 27, 2021, a search warrant was issued by the circuit court judge (the "Search Warrant").  See Search Warrant attached hereto as **Exhibit H**.

44.    The Search Warrant authorized GPD to enter the Colliers International office and seize certain categories of items which "are being kept and/or was used and/or obtained in and/or is evidence of a felony

---

[2] *See Id.*, Motion of June 8, 2022.  The Arbitration Award rejected Bosshardt's claims that the Claimants had "secretly cop[ied] [Bosshardt's] files that they were working on or had worked on." Ex. G ¶77.  Expert testimony provided at the arbitration hearing revealed that "none of the documents" at issue "would provide any competitive advantage to the departing agent or would be of value to [Bosshardt's] competitors.  Indeed, [Bosshardt] never identified any copied files or documents that it deemed confidential or how [Bosshardt] was somehow harmed by these documents being copied." Ex. G ¶80  The Arbitration Award even found that Bosshardt had voluntarily "collaborated" with the Brokers in turning over the applicable files and that "[Bosshardt] clearly both wanted and needed for the [Brokers] to have access to these files in order for [Bosshardt] to financially benefit from these transactions." Ex. G ¶82

violation of the laws of the State of Florida, to-wit: Florida Statute 812.081(2)-Trade Secret Theft."[3]  *Id.*

45.     The "defendants" named in the Search Warrant were Lauren Edwards, Daniel Drotos, Rory Causseaux, Michael Ryals, Christian Oldenburg, and/or Colliers International."  *Id.* The Plaintiffs were <u>not</u> named in the Search Warrant.

### GPD Policy and the Decision to Use SWAT to Serve the Warrant

46.     Gainesville Police Department General Order 1.4 ("General Order 1.4"), as applicable at that time, provided the standards according to which GPD searches were to be conducted.  Section A.5 addressed searches involving SWAT.  See the then applicable General Order 1.4 attached hereto as **Exhibit I**.  The order provided:

> 5. High-Risk Warrants: After consulting with a supervisor, the Department member seeking the warrant shall notify the Special Weapons and Tactics (SWAT) Commander, as soon as possible, when aware of the need to execute a high-risk warrant.

---

[3] The ten categories of items included in the Search Warrant were (1) Electronic recording devices; (2) Mobile phones; (3) Computers; (4) Tablets; (5) Emails containing or showing possession of a Trade Secret or Article taken from Bosshardt Realty without permission; (6) Texts containing or showing possession of a Trade Secret or Article taken from Bosshardt Realty without permission; (7) Identification showing possession, ownership, or use of the electronic device; (8) Identification showing possession of a Trade Secret or Article taken from Bosshardt Realty without permission; (9) Trade Secret(s) or Article(s) taken from Bosshardt Realty without permission; and (10) Devices or combinations of devices used for computer data storage.

    i. The following guidelines represent the general criteria to be met prior to the use of SWAT for high-risk search and arrest warrants:

        a. The crime at issue is a violent crime or is commonly associated with crimes of violence.

        b. The location in question is barricaded against entry or the suspect is inside a location, vehicle, or hidden from view and refuses to submit to arrest.

        c. There is reason to believe the suspect(s) is armed and may use weapons against law enforcement officers.

        d. The suspect's background reveals a propensity towards violence.

        e. The location in question is known to be inhabited or frequented by subjects with a propensity towards violence.

        f. It is not practical to arrest the suspect(s) outside the location in question while meeting operational objectives.

    ii. Determination: The SWAT Commander will make the determination, based upon the facts supplied by the Department member requesting a warrant, as to whether the SWAT team will be used to execute the warrant.

47. The GPD Internal Affairs Department ("IA") conducted an investigation of the SWAT Raid and, according to the investigative report



which IA prepared of its investigation (the "IA Report"), not one of the policy's stated criteria were met in this case. See IA Report, page 11, attached hereto as **Exhibit J**.  Not a single one. Indeed, it is puzzling how the Search Warrant initially even came to the attention of the SWAT Commander for consideration of deployment of a SWAT team.

48.     In addition to General Order 1.4, the GPD Special Weapons and Tactics Team Administrative Procedures (the "Administrative Procedures") also contains "general guidelines for handling high-risk warrant service." See Administrative Procedures Sec. 2.01.00 attached hereto as **Exhibit K**.

49.     The Administrative Procedures state that it is "the policy of GPD SWAT Team to provide assistance to any Bureau/Division/Unit of the Gainesville Police Department . . . in the service of high-risk search and arrest warrants." *Id.* at Sec. 2.00.02.

50.     To this end, the Administrative Procedures provide a list of "general criteria to be met prior to the use of SWAT for high-risk search or arrest warrants.  **One or more criteria must be met to authorize the use of SWAT." (**the "General Criteria") *Id.* at Sec. 2.01.00 (emphasis added).  These criteria are identical to those in General Order 1.4, and so none of the stated criteria were met in this case.

51.    The Administrative Procedures also contain a matrix ("SWAT Search Matrix").   This matrix assigns various point values to various characteristics of a particular search, such as whether the search warrant is a search warrant for drugs or whether the subject of the search warrant has used firearms during crimes.  See **Exhibit L**.  The points are then tallied, and a particular search will be assigned to one of three categories.

52.    A 0-9 point score will place a search within the category of "SWAT normally not required."   A 10-19 point score will place a search within the category of "Consultation with SWAT Commander required" and a 20+ point score will place a search within the category of "SWAT is required for service/execution."   The final block in the matrix advises that, "NOTE: The SWAT Commander may weigh factors heavier based on known information."

53.    According to the IA Report, Detective Pinkston had completed a SWAT Search Matrix prior to the service of the Search Warrant. The SWAT Search Matrix completed by Detective Pinkston registered a score total of 2 points, which placed it toward the very bottom on the lowest category— "SWAT normally not required." *Id.*

54.     However, SWAT Commander West rejected Detective Pinkston's matrix and completed his own SWAT Search Matrix.  *Id.* According to the IA Report, during the course of an interview with Commander West, Commander West stated that adjustments like this are commonplace and a normal policy for the GPD after the SWAT team receives a SWAT Search Matrix from an investigating officer.  *Id.*

55.     Commander West's SWAT Search Matrix for the Search Warrant registered a total score of 10 points, qualifying for the lowest range of the mid-tier category labeled "Consultation with SWAT Commander required." See West Search Matrix attached as **Exhibit M**.  On his SWAT Search Matrix, West indicated the following characteristics applied to the Search Warrant, with the points attributed to each of these characteristics in parentheses: "Search warrant for items that could be destroyed" (2 points); "Firearms readily accessible to suspects (half value if unknown)" (2 points—half the value, indicating that it was unknown whether firearms were accessible); and "Service of warrant would require forced entry if admittance is denied" (6 points).

56.     In other words, Commander West's revision of the SWAT Search Matrix resulted in a middle-tier score based on arbitrary and capricious factors *that would be present in the case of nearly any search warrant.*

57.     Further, according to the IA Report:

> During the interview with Lieutenant West it was discovered there are other factors, in addition to information listed in the Matrix and the general criteria listed in the policy, that are taken into consideration when making the decision to utilize the SWAT Team.  Without going into great detail, some of these other factors could include the size of the structure, the number of stories, the presence of multiple living quarters, the number of doors, the number of windows, the presence/number of other buildings on the property, the accessibility or inaccessibility of any portion of the property and/or structures on the property, the potential for the destruction of evidence, and the anticipated number of occupants.  This list is not exhaustive and is only meant to provide an idea of the potential number of factors that are considered during the planning of SWAT operations.

See IA Report, Exhibit J, page 12.

58.     The number of windows!

59.     In other words, notwithstanding the directive in the Administrative Procedures that SWAT was not to be used in the absence of at least one of the General Criteria, and notwithstanding the quantitative/objective appearance of the SWAT Search Matrix, the actual



GPD policy at that time was designed, implemented, and practiced in such a way as to delegate full unilateral authority to the SWAT commander to determine when SWAT would be deployed to support service of a search warrant.

60.    Naturally, under these circumstances, the role of SWAT in supporting the service of search warrants expanded over time.

61.    The IA Report continued:

> The interview with Detective Pinkston and Lieutenant West also revealed that utilizing the GPD SWAT Team for the execution of search warrants with various risk levels has become **a fairly standard practice**. . . . It is estimated that this practice has been occurring for approximately 1 year . . .
>
> As stated previously in this report, one of the reasons for this practice is that multiple factors surrounding the involved location, individuals, investigation, and/or possible punishments may not be fully addressed and/or accounted for in the high risk warrant criteria and/or the Matrix.

See IA Report, Exhibit J, page 14 (emphasis added).

62.    The predictable result of this policy was the SWAT Raid on Colliers International on June 2, 2021, during which a group of innocent commercial real estate brokers completely uninvolved in the alleged underlying crime and whose names did not appear on the search warrant



began their workday confronted by a raid on their office by a heavily armed and body-armored SWAT team that marched them out of their office at gunpoint, bound them, detained them for hours, and seized their Personal Property.

63.     It was plainly feasible and within GPD/the City of Gainesville's control to implement a policy that did not result in the use of SWAT in aid of service of search warrants that was not arbitrary, capricious, and unconstitutional.  The final paragraphs of the IA Report state:

> . . . GPD is in the process of reviewing all aspects involving the written policy and procedures regarding the practices, utilization, and/or the approval process for the utilization of the SWAT Team.
>
> Prior to the issuance of this report, GPD had already implemented the requirement that all requests for the use of the SWAT Team be approved th[r]ough a level of at least an Assistant Chief and/or the Chief of Police.

See Exhibit J, IA Report, page 17.

64.     In other words, the IA Report admits that the Police Department policies at the time was to give SWAT commanders unlicensed, unreviewed, unilateral authority to deploy massive force against innocent civilians.

65.     The Police Department revised General Order 1.4 on May 11, 2022.  *See*, **Exhibit N**, Revised GPD General Order 1.4 at Section III.A.5

concerning High-Risk Warrants.  Now, pursuant to the revised GPD General Order 1.4, the service of "High Risk" warrants can only be assisted by SWAT where such assistance is "reviewed and approved by the Assistant Chief of Police in the Patrol Support Bureau." *Id.* at III.A.5.i.  Where the warrant does not involve "High Risk" service, SWAT may be deployed where "reviewed and approved only by the Chief of Police." *Id*. at III.A.5.ii.

### The Service of the Warrant

66.    Despite the SWAT Commander's supposed concern over "potential for destruction of evidence," the SWAT Raid took place on the morning of June 2, 2021, over ten months after Aaron Bosshardt filed his Police Report.

67.    Approximately 14 SWAT members executed the Search Warrant, plus approximately six additional members who were part of the command structure, intelligence/support officers, and/or medical support.   See Exhibit J, IA Report, page 13.   In other words, twenty or more law enforcement personnel were deployed against three unarmed civilians with no criminal history working lawfully in an otherwise unremarkable professional office. The "Equipment Used" for the raid included a "SWAT Van, GPD SWAT APC, SWAT Shields, SWAT Leg guards, SWAT Vest,



SWAT Helmet, and SWAT Tools (Ram, Halligan)." See GPD After Action Report attached hereto as **Exhibit O**.

68.    The SWAT Operations Briefing, which indicates a briefing occurred just prior to deployment, continued to reference the 160 electronic files Lauren Edwards downloaded from Bosshardt's "Appfiles" account "without permission" as the alleged crime committed in the case. The list of files — files the civil Arbitrator later determined were not trade secrets – included completely uninteresting and useless items like ordinary real estate listings.[4]

69.    It is unclear what time members of the SWAT team arrived on site and pre-execution surveillance began, but it was as much as three hours before 9:00 a.m.  In other words SWAT had ample time to enter the building and seize electronics before uninvolved civilians arrived.

70.    Moreland arrived at the Colliers International office that morning at approximately 9:00 a.m. and Hurst followed her shortly thereafter at 9:15 a.m.  SWAT team members surveilled Hurst and Moreland

---

[4] It would be fair to observe that the civil Arbitrator is completely different from law enforcement, and the civil trade secret statute is not precisely the same as the criminal trade secret statute. But they are essentially identical. And trade secret issues are *usually* civil issues with which the Arbitrator was much more familiar than were the GPD detectives and SWAT officers.

entering the premises.  Also in the building that morning with Hurst and Moreland was Daniel Drotos ("Drotos"), one of the Brokers and an individual named as a defendant in the Search Warrant.

71.    The SWAT team approached the front doors of Colliers International at 9:25 a.m. *See* Exhibit IA Report, Exhibit J, page 7.  Hurst and Moreland heard a pounding at the door and someone shouting "Gainesville Police, open up."  Both Hurst and Moreland believed that someone was playing a prank in poor taste.  In fact, the limited body-camera footage released by GPD shows that by that time, a SWAT team member had already opened the unlocked front door of the office and was positioned in the doorway behind a SWAT shield.

72.    This was followed by another loud knock that shook the office building, and a voice yelling for everyone inside to come out with their hands up.  Drotos, the only other person in the building at that time, could be heard asking what was happening.  Hurst looked out his window to see that the SWAT unit had blocked off the street in front of the office.  An armored SWAT vehicle was parked in the middle of the Colliers International parking lot, and there were approximately 15 GPD SWAT team

members in full riot gear, some of whom were sheltering behind SWAT

shields and aiming military-style rifles at the office building.

73.    Hurst and Moreland, who were on the second story at the time,

proceeded to the stairwell to go downstairs.  They descended with their

hands up, as one or more SWAT team member or members aimed their

loaded, ready-to-fire weapons on the civilians.

74.    Once in SWAT custody, Hurst and Moreland were zip tied and

searched. Officers read the search warrant to them and said that,

notwithstanding the fact their names did not appear on the Search Warrant,

their personal electronics were to be seized including their cell phones, lap

top computers, and Hurst's Apple watch.

75.    After approximately 15 minutes, Hurst and Moreland were

released from their zip ties and moved to a conference room inside the

Colliers International office while the office was searched.  From the time the

SWAT Raid began to the time Hurst and Moreland were released from the

conference room was approximately 2 hours and 10 minutes.  *See* IA Report,

Exhibit J, pages 7 and 8.

76.    As additional employees of Colliers International arrived for

work that morning, they were subjected to the same treatment: search,

confiscation of their personal electronics, and then detention in the conference room until the search was completed.

77.    Harrell was among these employees.  After his cell phone was seized by a GPD officer, Harrell was requested to provide his phone password.  Harrell hesitated to respond at which point he was told that he could either provide the password or a warrant would be obtained for that, too.  Harrell provided his password.  Harrell's cellphone was not returned, and he was delivered to the conference room to wait out the remainder of the search.

## <u>COUNT I</u>

### *ACTING WITH RECKLESS DISREGARD FOR THE TRUTH IN OBTAINING A SEARCH WARRANT IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION OF THE UNITED STATES COGNIZABLE UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT DETECTIVE RONALD A. PINKSTON*

78.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 77 herein.

79.    Detective Pinkston stated deliberate falsehoods or showed reckless disregard for the truth in his Application for the Search Warrant as alleged at paragraphs 36 through 42 above.



80.    The allegedly false or omitted information was material to the court's finding of probable cause and issuance of the Search Warrant.

81.    The Search Warrant was therefore void and unconstitutional.

82.    Plaintiffs' seizure, search, detention, and the seizure of their personal property—all based upon the Search Warrant—were therefore also unconstitutional in violation of the Fourth Amendment to the Constitution of the United States of America.

83.    Detective Pinkston's conduct violated clearly established statutory or constitutional rights of the Plaintiffs of which a reasonable person would know, specifically their Fourth Amendment rights under the United States Constitution to be free from unreasonable searches and seizures.

WHEREFORE Plaintiffs JASON HURST, NICOLA MORELAND, and BENNETT HARRELL respectfully pray that this Court enter judgment in their favor under 42 U.S.C. § 1983 against DEFENDANT RONALD A. PINKSTON in his individual capacity and award Plaintiffs any and all compensatory damages, punitive damages, attorneys' fees, expenses, costs, and any other such relief to which they are entitled and that this Court deems just, appropriate, and proper.

## COUNT II

### EXCESSIVE USE OF FORCE IN DEPLOYING SWAT TO SERVE THE SEARCH WARRANT IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION OF THE UNITED STATES COGNIZABLE UNDER 42 U.S.C. § 1983 AGAINST DEFENDANTS CITY OF GAINESVILLE, THE GAINESVILLE POLICE DEPARTMENT, AND SWAT TEAM COMMANDER LIEUTENANT M. WEST (AND/OR SUCH OTHER POLICY MAKER(S) RESPONSIBLE FOR THE DECISION TO DEPLOY SWAT)

84.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 77 herein.

85.     The deployment of SWAT to execute the Search Warrant was an excessive use of force constituting an unreasonable search and seizure that violated Plaintiffs' rights under the Fourth Amendment to the Constitution to the United States of America.

86.     The decision to deploy SWAT to execute the Search Warrant was pursuant to a policy or custom of the City of Gainesville and the Gainesville Police Department.

87.     The decision to deploy SWAT was pursuant to a policy or custom because it was made according to a process officially adopted by the City of Gainesville and the Gainesville Police Department.



88.     Alternatively, the decision to deploy SWAT was a policy because it was made by Commander West, an official of such rank that he could be said to have been acting on behalf of the municipality, because he had final policy making authority to determine whether to deploy SWAT to execute a search warrant.

89.     Further in the alternative, the decision to deploy SWAT was a policy or custom because the City of Gainesville and the Gainesville Police Department failed to properly train or supervise Commander West in respect to his decisions on when to deploy SWAT to execute a search warrant to such an extent that such failure evidenced a deliberate indifference to the rights of the inhabitants of the City of Gainesville.

90.     The custom or policy constituted deliberate indifference to Plaintiffs' Fourth Amendment rights.

91.     The custom or policy caused the deployment of SWAT to execute the Search Warrant and thereby caused the violation of Plaintiffs' Fourth Amendment rights.

92.     The deployment of SWAT to execute the Search Warrant violated clearly established statutory or constitutional rights of the Plaintiffs of which a reasonable person would know, specifically their Fourth

Amendment rights under the United States Constitution to be free from unreasonable searches and seizures.

WHEREFORE Plaintiffs JASON HURST, NICOLA MORELAND, and BENNETT HARRELL respectfully pray that this Court enter judgment in their favor under 42 U.S.C. § 1983 against Defendants CITY OF GAINESVILLE, THE GAINESVILLE POLICY DEPARTMENT, and SWAT TEAM COMMANDER LIEUTENANT M. WEST (or such other policy maker(s) responsible for the decision to deploy SWAT) in his individual capacity, and award Plaintiffs any and all compensatory damages, punitive damages, attorneys' fees, expenses, costs, and any other such relief to which they are entitled and that this Court deems just, appropriate, and proper.

## COUNT III

*EXCESSIVE USE OF FORCE IN SERVING THE SEARCH WARRANT IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES COGNIZABLE UNDER 42 U.S.C. § 1983 AGAINST DEFENDANTS CITY OF GAINESVILLE, THE GAINESVILLE POLICE DEPARTMENT, SWAT TEAM COMMANDER LIEUTENANT M. WEST (AND/OR SUCH OTHER POLICY MAKER(S) WHO WERE RESPONSIBLE FOR ORDERING OFFICERS TO IMPLEMENT THE OPERATION PLAN IMPLEMENTED BY SWAT IN EXECUTING THE SEARCH WARRANT), DETECTIVE RONALD A PINKSTON, ALL DEFENDANTS WHO CAUSED THE EXCESSIVE USE OF FORCE THROUGH THEIR SUPERVISORY ROLE CONCERNING THE SERVICE*



*OF THE WARRANT, AND ALL DEFENDANTS DIRECTLY ENGAGED IN*
*THE EXCESSIVE USE OF FORCE IN SERVING THE SEARCH WARANT*

93.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 77 herein.

94.     The service of the Search Warrant involved the excessive use of force in violation of Plaintiffs' Fourth Amendment rights in so far as it:

a. Involved deployment of a 14-20 member SWAT team, members of which wore body armor and helmets, wielded Swat Shields, and carried military-style rifles;

b. involved SWAT team members pointing their military-style rifles at Hurst and Moreland as they exited the Colliers International office, despite the facts that they showed no resistance, were known to have no connection to the underlying Search Warrant, and there was no basis to believe either Hurst or Moreland would be violent or otherwise resist police;

c. Hurst and Moreland were zip tied for approximately 15 minutes despite the fact that that they showed no resistance, were known to have no connection to the underlying Search Warrant, and

there was no basis to believe either Hurst or Moreland would be violent or otherwise resist police; and

d. Hurst and Moreland were detained for nearly two hours despite the fact that they showed no resistance, were known to have no connection to the underlying Search Warrant, and there was no basis to believe either Hurst or Moreland would be violent or otherwise resist police.

95. The City of Gainesville and the Gainesville Police Department are liable for the  excessive use of force used to execute the Search Warrant because the decision to deploy SWAT to execute the search was pursuant to a policy or custom of the City of Gainesville and the Gainesville Police Department, and the excessive use of force occurred because of the deployment of SWAT.

96. Detective Pinkston is liable for the excessive use of force used to execute the Search Warrant in his personal capacity because he breached a duty imposed by state or local law when he secured the Search Warrant via misrepresentations in the Application and this breach caused the excessive use of force suffered by Plaintiffs because the excessive use of force would not have occurred were it not for the Search Warrant.

97.     SWAT Team Commander West (and/or such other policy maker(s) as were responsible for ordering other GPD police officers to implement the operational plan implemented by SWAT in executing the Search Warrant) is liable for the excessive use of force used to execute the Search Warrant in his personal capacity because he made the decision to deploy SWAT to execute the search and ordered his subordinates to implement the operational plan used in executing the search, which plan involved a facially excessive use of force.

98.     All Defendants acting in a supervisory role during the execution of the Search Warrant who issued direct orders to subordinates to use excessive force are liable for those excessive uses of force they ordered.

99.     All Defendants who directly engaged in the excessive use of force during the execution of the Search Warrant are liable to Plaintiffs for those excessive uses of force in which they individually engaged.

100.    All incidences of excessive use of force alleged herein were violations of clearly established statutory or constitutional rights of the Plaintiffs of which a reasonable person would know, specifically Plaintiffs' Fourth Amendment rights under the United States Constitution to be free from unreasonable searches and seizures.

WHEREFORE Plaintiffs JASON HURST, NICOLA MORELAND, and BENNETT HARRELL respectfully pray that this Court enter judgment in their favor under 42 U.S.C. § 1983 against Defendants CITY OF GAINESVILLE, THE GAINESVILLE POLICE DEPARTMENT, DETECTIVE RONALD A. PINKSTON in his individual capacity, SWAT TEAM COMMANDER LIEUTENANT M. WEST (and/or such other policy maker(s) as were responsible for ordering other GPD police officers to implement the operational plan implemented by SWAT in executing the Search Warrant) in his/their individual capacity, all Defendants who caused the excessive use of force through their supervisory role concerning the service of the Search Warrant by ordering the excessive use of force in their individual capacities, and all Defendants who directly engaged in the excessive use of force in serving the Search Warrant in their individual capacities, and award Plaintiffs any and all compensatory damages, special damages including emotional/psychological harms, punitive damages, attorneys' fees, expenses, costs, and any other such relief to which they are entitled and that this Court deems just, appropriate, and proper.

## COUNT IV

***UNREASONABLE SEIZURE OF PLAINTIFFS' PERSONAL PROPERTY IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES COGNIZABLE UNDER 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS RESPONSIBLE FOR THE SEIZURE OF PLAINTIFFS' PERSONAL PROPERTY THROUGH THEIR SUPERVISORY ROLE CONCERNING THE SERVICE OF THE WARRANT, AND ALL DEFENDANTS DIRECTLY ENGAGED IN THE SEIZURE OF PLAINTIFFS' PERSONAL PROPERTY***

101.   Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 77 herein.

102.   Defendants lacked probable cause to believe that Plaintiffs' Personal Property contained evidence of the alleged trade secret theft because Plaintiffs were mere bystanders that happened to have their place of business raided by SWAT while they were at work.

103.   Plaintiffs' Personal Property fell outside the scope of the items which GPD was authorized to seize under the Search Warrant because, although the Search Warrant allowed the seizure of "Mobile phones" (see fn. 1, above) the Search Warrant was limited to those items which "are being kept and/or was used and/or obtained in and/or is evidence of a felony violation of the laws of the State of Florida, to-wit: Florida Statute 812.081(2)-Trade Secret Theft."  This language cannot plausibly be read to include the



personal cell phones and smart watches of mere bystanders that happened to have their place of business raided by SWAT while they were at work.

104.    All incidences of seizure of Plaintiffs' Personal Property alleged herein were violations of clearly established statutory or constitutional rights of the Plaintiffs of which a reasonable person would know, specifically Plaintiffs' Fourth Amendment rights under the United States Constitution to be free from unreasonable searches and seizures.

WHEREFORE Plaintiffs JASON HURST, NICOLA MORELAND, and BENNETT HARRELL respectfully pray that this Court enter judgment in their favor under 42 U.S.C. § 1983 against all Defendants having caused the seizure of their Personal Property through such Defendants' supervisory role concerning the service of the Search Warrant and all Defendants directly engaged in the seizure of Plaintiffs' Personal Property, and award Plaintiffs any and all compensatory damages, punitive damages, attorneys' fees, expenses, costs, and any other such relief to which they are entitled and that this Court deems just, appropriate, and proper.

## COUNT V

### *UNREASONABLE SEIZURE OF PLAINTIFF BENNETT HARRELL IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE*

### UNITED STATES COGNIZABLE UNDER 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS WHO CAUSED THE SEIZURE OF PLAINTIFF BENNETT HARRELL THROUGH THEIR SUPERVISORY ROLE CONCERNING THE SERVICE OF THE WARRANT AND ALL DEFENDANTS DIRECTLY ENGAGED IN THE SEIZURE OF PLAINTIFF BENNETT HARRELL

105.   Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 77 herein.

106.   Plaintiff Harrell drove into the Colliers International parking lot while the search was in process.

107.   A GPD officer questioned him as to whether he worked for Colliers International and when Harrell replied that he did, he was detained for nearly two hours, searched, and had his cell phone and laptop seized.

108.   Harrell was therefore seized and searched as those terms are used in the Fourth Amendment to the Constitution of the United States of America.

109.   There was no probable cause to seize or search Harrell because he was not named in the Search Warrant, and he had nothing to do with the underlying case.



110.   GPD had no other basis on which to avoid the Fourth Amendment's requirement that probable cause must exist prior to a search or seizure.

111.   The search and seizure of Harrell alleged herein were violations of clearly established statutory or constitutional rights of Harrell of which a reasonable person would know, specifically Plaintiff Harrell's Fourth Amendment rights under the United States Constitution to be free from unreasonable searches and seizures.

WHEREFORE Plaintiff BENNETT HARRELL respectfully prays that this Court enter judgment in his favor under 42 U.S.C. § 1983 against all Defendants who caused his seizure by GPD through such Defendants' supervisory roles concerning the service of the Search Warrant and all Defendants directly engaged in his seizure by GPD, and award Harrell any and all compensatory damages, punitive damages, attorneys' fees, expenses, costs, and any other such relief to which they are entitled and that this Court deems just, appropriate, and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated July 19, 2022.



**CHILDERS LAW, LLC**

2135 NW 40th Terrace
Suite B
Gainesville, Florida 32605
tel. 866-996-6104
fax 407-209-3870

*/s/ Seldon J. Childers*

Seldon J. Childers
Florida Bar No. 61112
jchilders@smartbizlaw.com
notice@smartbizlaw.com